UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                                                                                                    :

LICINIO LINCHO,
                                                                                                                    :

                Plaintiff,                                                  :          OPINION AND ORDER

                                                                                                                     :

            -v.-
                                                                                                                  :          17 Civ. 4752 (GWG)

NATIONAL RAILROAD PASSENGER
CORPORATION, and AMTRAK,.                    :

               Defendants.                   :
---------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Licinio Lincho brings this action against the National Railroad Passenger Corporation and "Amtrak" (the name under which the National Railroad Passenger Corporation does business) ("Amtrak") for injuries resulting from his fall from a ladder at a construction site. Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56.[1] For the following reasons, the motion is granted.

I. BACKGROUND

    A. Facts

      The following facts are undisputed unless otherwise stated.

---

[1] See The National Railroad Passenger Corporation and Amtrak's Notice of Motion for Summary Judgment, dated July 2, 2018 (Docket # 22) ("Def. Not."); Declaration of Daniel Zemann, Jr. in Support of the National Railroad Passenger Corporation and Amtrak's Motion for Summary Judgment, dated July 2, 2018 (Docket # 23) ("Zemann Decl."); The National Railroad Passenger Corporation and Amtrak's Memorandum of Law in Support of Summary Judgment, dated July 2, 2018 (Docket # 24) ("Def. Mem."); Affidavit of Jorge Silva, dated June 20, 2018 (Docket # 25) ("Silva Aff."); Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment, dated July 25, 2018 (Docket # 28) ("Pl. Mem."); Memorandum of Law in Reply to Plaintiff's Opposition and in Further Support of the National Railroad Passenger Corporation and Amtrak's Motion for Summary Judgment, dated August 13, 2018 (Docket # 29) ("Def. Reply").

The City of New York is the owner of the Bryant Avenue Bridge located at 1165 Garrison Avenue in Bronx, New York. See The National Railroad Passenger Corporation and Amtrak's Responses to Plaintiff's First Set of Interrogatories, dated Dec. 13, 2017 (annexed as Ex. 11 to Zemman Aff.) ("Def.'s Response to Pl.'s Interrogs."), No. 6; NY State Highway Bridge Data: October 31, 2017 (annexed as Ex. B to Def.'s Response to Pl.'s Intterogs.) ("NY State Highway Bridge Data"), 5. The Bryant Avenue Bridge runs over land owned by Amtrak. See Silva Aff. ¶ 6; Deposition of Carl Stypinski, dated April 20, 2018 (annexed as Ex. 7 to Zemann Decl.) ("Stypinski Dep."), 43; NY State Highway Bridge Data, at 5. Amtrak trains run underneath the Bryant Avenue Bridge on land that Amtrak owns. See Silva Aff. ¶¶ 6, 8.

In June 2014, the New York City Department of Transportation ("NYCDOT") awarded a contract for the rehabilitation of the Bryant Avenue Bridge to Judlau Contracting, Inc. ("Judlau"). See Letter from Polly Trottenberg, dated June 20, 2014 (annexed as Ex. 14 to Zemann Decl.). Judlau served as the general contractor on the project. Stypinski Dep. at 41. The contract involved the removal and reconstruction of the entire bridge superstructure, Silva Aff. ¶ 2, as well as concrete work and painting on the parapet walls underneath the bridge, Stypinski Dep. at 42-44. Judlau performed the project from August 2014 until July 2015. Silva Aff. ¶ 3.

In order to access the Bryant Avenue Bridge and to perform work underneath the bridge on the parapet walls, Judlau required access to Amtrak's land. See Silva Aff. ¶ 6. In exchange for a payment of $1000, Amtrak provided Judlau with a temporary permit to "enter" upon its property to do the bridge work. See National Railroad Passenger Corporation, Temporary Permit to Enter Upon Property, dated October 8, 2014 (annexed as Ex. 9 to Zemann Decl. and as Ex. 1 to Silva Aff.) ("Permit"), ¶¶ 1, 4. Amtrak could revoke the permit at any time. Id. ¶ 9.

Judlau personnel required Amtrak ID cards to access the property. See Silva Aff. ¶ 7.

The Permit itself required compliance with numerous safety measures to ensure that Judlau's work did not interfere with the safe operation of the railroad. See Permit ¶¶ 6-8, 10, 12-13. The Permit required that "[a]ll work on, over, under, within or adjacent to" Amtrak's property be performed in accordance with a document titled "Specifications Regarding Safety and Protection of Railroad Traffic and Property." Id. ¶ 10. The Specifications listed various requirements related to safety. See Specifications Regarding Safety and Protection of Railroad Traffic and Property (annexed as Attachment A to Permit) ("Specifications"). For example, the Specifications required Judlau personnel to coordinate with Amtrak personnel in order to maintain safety around the tracks, including by attending a pre-entry meeting where Judlau was required to submit "plans, computations, a Site Specific Safety Work Plan and site-specific work plans that include a detailed description of proposed methods for accomplishing the work and protecting railroad traffic" for approval by Amtrak's Chief Engineer, Specifications ¶ 1; by consulting with Amtrak's Chief Engineer to arrange for Amtrak personnel to provide protection to Judlau workers in the form of Track Watchmen, Flagmen, Signalmen, and other protection personnel, id. ¶ 4; by requiring Judlau to obtain written permission from Amtrak to "foul" an active track, id. ¶ 6,[1] and to verify the timing of scheduled track outages before scheduling work in the vicinity of the tracks, id. ¶ 7; and by obtaining permission from the Chief Engineer before placing equipment in the vicinity of operating tracks or storing material or equipment on the Railroad's property, id. ¶¶ 9-10. The Specifications do not provide for Amtrak personnel to

---

[1] "Fouling a track" is defined by federal regulation as "the placement of an individual or an item of equipment in such proximity to a track that the individual or equipment could be struck by a moving train or on-track equipment, or in any case is within four feet of the field side of the near running rail." 49 C.F.R. § 214.7 (2017).

supervise the safety or manner of performance of contractors' work unrelated to the work's potential interference with railroad operations. The Specifications explicitly state that the pre-entry meeting and the provision of Amtrak protection personnel "shall not relieve Permittee/Contractor of its complete responsibility for the adequacy and safety of its operations." Id. ¶ 1, accord id. ¶ 4.

Amtrak and its employees had the authority to suspend or stop Judlau's work and to revoke Judlau's permission to enter Amtrak's premises upon Judlau's violation of the Railroad's safety rules, regulations and requirements. See Specifications ¶ 2; Stypinski Dep. at 21-22. In his deposition testimony, Carl Stypinski, who was assigned as Amtrak's project manager for the Bryant Avenue Bridge project, Stypinski Dep. at 31, gave several examples of instances in which he had "shut down a job," see id. at 22-23. In particular, Stypinski testified that he had "shut down a job" upon observing "[p]eople trying to set a crane up without having the proper authorization or inspections, people trying to climb a rickety ladder, like some homemade thing, people leav[ing] their messes around and that stuff can blow on the railroad and a train can hit it, and . . . people going out on a bridge without having their safety harnesses on where there's a possibility they can fall . . . ." Id. at 23. In addition, Stypinski testified that if he observed a contractor without "proper personal protective equipment," he could "ask that person to leave, put their stuff on, and if they refuse, go home and have a nice day." Id.

On April 24, 2015, Lincho was employed by Judlau Contracting, Inc. and was assigned to work on the Bryant Avenue Bridge project. See Deposition Testimony of Licinio Lincho (annexed as Ex. 5 to Zemman Decl.) ("Lincho Dep"), 10-11. On that date, Lincho had been working on the Bryant Avenue Bridge project for approximately six months, id. at 16, and had been working for Judlau for seven years, id. at 10. Lincho testified that the only people who

4

directed his work at the Bryant Avenue Bridge project were Benito Mendes, id. at 16-17, 39, a foreman with Judlau, id. at 16-17, and a super employed by Judlau, id. at 39-40. On April 24, 2015, Lincho was working on top of the Bryant Avenue Bridge. See id. at 23-24. At some point, Mendes directed Lincho to stop working on top of the bridge and to instead assemble a scaffold underneath the bridge out of two-by-four planks of wood. See id. Underneath the bridge structure, there were thin metal rods that resembled large screws spaced at regular intervals sticking out of the concrete parapet walls. See Photograph of Bridge (annexed as Ex. 6 to Zemman Aff.) ("Photograph of Bridge"). Lincho testified that the two-by-fours were already resting on these metal rods when he ascended the ladder to work. See Lincho Dep. at 36. His job was to nail these two-by-fours together to assemble a scaffold. Id. To perform this work, Lincho ascended an extension ladder that was placed on a stone surface underneath the bridge, at a height of approximately 15 or 16 feet. Id. at 24, 33. The ladder was not affixed by its feet or top to either a wall or the ground. Id. at 33. No one held the ladder while Lincho worked. Id. at 34. Lincho did not wear a safety harness while working on the ladder, and was not provided with one. Id. at 33.

While Lincho was working on the ladder, Mendes was directing him to work quickly. See id. at 33. While Lincho was on the ladder, he pulled an approximately 16-foot-long two-by-four plank that had been resting on a the metal rods to reposition it in order to nail it into the scaffold structure he was building. See id. at 35-38. As he pulled the two-by-four, it turned, and the end of the beam hit him in the chest, causing him to fall off the ladder and onto the tracks below him. Id. After he fell, a co-worker, Joao Martino, see id. at 22, helped him get up, id. at 39, and, at Mendes' direction, Lincho waited inside a container that Judlau employees used to change into their uniforms, see id. at 17-18, 40, until Mendes drove him home at the end of the

5

workday, id. at 40-41.  Lincho testified that he told Mendes that he wanted to go to the hospital but Mendes refused to take him, told him to wait, and told him that his pain and injury would pass.  See id. at 40.  Lincho testified that he asked Mendes to a write a report documenting the injury, but Mendes and Judlau's super refused for several days.  See id. at 42-43.  Lincho ultimately sought medical attention from his doctor three days after the accident.  See id. at 42.  Since the accident, Lincho testified that he has had pain in his neck, back, and shoulders, and has not been able to return to work.  See id. at 43-49.

On December 30, 2015, Lincho brought suit against the City of New York and the NYCDOT in Bronx Supreme Court.  See Notice of Commencement of Action, dated Dec. 30, 2015 (annexed as Ex. 3 to Zemann Aff.).  Defendants prevailed on summary judgment because Lincho failed to file a timely notice of claim and failed to move for leave to file an untimely notice of claim before the expiration of the statute of limitations.  See Lincho v. City of New York, No. 27151/2015, slip op., (Sup. Ct. Apr. 12, 2017) (annexed as Ex. 4 to Zemann Aff.).

B. Procedural History

1. The Instant Complaint

On May 24, 2017, Lincho filed his complaint against defendants The National Railroad Passenger Corporation and Amtrak in Supreme Court of the State of New York in Bronx County.  See Complaint, dated May 24, 2017 (annexed as Ex. A to Notice of Removal, dated June 23, 2017 (Docket # 5) ("Notice of Removal")) ("Compl.").  On June 26, 2017, Amtrak removed the case to this Court.  See Notice of Removal.  Lincho sets forth four causes of action in his complaint: 1) common law negligence; 2) violation of Section 200 of the Labor Law of New York State; 3) violation of Section 240 of the Labor Law of the State of New York; and 4) violation of Section 241 of the Labor Law of the State of New York based on a violation of Rule

23 of the Industrial Code of the State of New York.  Compl.

Amtrak moved for summary judgment on all claims on July 12, 2018.  Def. Not.

II  STANDARD OF REVIEW ON SUMMARY JUDGMENT MOTIONS

Granting summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); see also Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence").

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party.  Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (citation omitted) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," Anderson, 477 U.S. at 256.  Thus, "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions

that are conclusory . . . or based on speculation . . . ." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

III. DISCUSSION

    A. New York Labor Law §§ 240 and 241

New York Labor Law §§ 240 and 241 "impose absolute liability on '[a]ll contractors and owners and their agents' for any breach of a statutory duty to provide safety measures that proximately cause an injury." Albanese v. City of New York, 5 N.Y.3d 217, 219 (2005). The purpose of the law is to place "ultimate responsibility for safety practices at building construction jobs where such responsibility actually belongs, on the owner and general contractor." Allen v. Cloutier Const. Corp., 44 N.Y.2d 290, 300 (1978) (citing N.Y. Legis. Ann., 1969, p. 407). As the Court of Appeals has observed, the statute "serves the salutary purpose of inducing owners and contractors to assure that only financially responsible and safety-conscious subcontractors are engaged so that a high standard of care might be maintained throughout the entire construction site." Id. at 301.

    The relevant text of Section 240 provides that:

> All contractors and owners and their agents . . . in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

8

N.Y. Labor Law § 240(1). Section 241(6) requires in relevant part that:

> All contractors and owners and their agents . . . when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements: . . . 6. All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places.

N.Y. Labor Law § 241(6).

Neither section defines the term "owners." See N.Y. Labor Law §§ 240-41; Copertino v. Ward, 100 A.D.2d 565, 566 (2d Dep't 1984) (making this observation with respect to section 241). "The key criterion" for being an 'owner' is 'the right to insist that proper safety practices were followed . . . .'" Nowak v. Smith & Mahoney, 110 A.D.2d 288, 290 (3d Dep't 1985) (quoting Copertino, 100 A.D.2d at 567). Because the statute imposes absolute liability, "it is the right to control the work that is significant, not the actual exercise or non-exercise of control." Mangiameli v. Galante, 171 A.D.2d 162, 164 (3d Dep't 1991) (internal quotations and citations omitted).[1]

Consistent with this principle, the Court of Appeals has declined to find ownership under Sections 240 and 241 where the actual owner had no choice but to allow the injured party to

---

[1] At least one court has broadly stated that "an owner is one who has an interest in the property and who fulfilled the role of owner by contracting to have the work performed for his benefit." Ogden v. City of Hudson Indus. Dev. Agency, 277 A.D.2d 794, 795 (3d Dep't 2000) (internal punctuation omitted) (quoting Mangiameli, 171 A.D.2d at 163). In fact, "contracting to have the work performed" is not a necessary condition for showing ownership. Rather, as the case cited by Ogden — Mangiameli — makes clear, it is merely a potential basis for showing ownership where the entity has an interest in the property. See Mangiameli, 171 A.D.2d at 163 (quoting a portion of Copertino, 100 A.D.2d at 566, which notes that the term "owner" "has been held to encompass a person who has an interest in the property and who fulfilled the role of owner by contracting to have the work performed for his benefit") (emphasis added).

9

enter its land.  See Scaparo v. Vill. of Ilion, 13 N.Y.3d 864, 866 (2009) (landowner where sewer lateral installation accident occurred not an "owner" under § 241(6) where landowner did not contract for the installation, had no choice but to allow Village workers to enter its property pursuant to a right-of-way, and did not grant the Village an easement or other property interest creating the right-of-way); Abbatiello v. Lancaster Studio Assocs., 3 N.Y.3d 46, 51-52 (2004) (building owner was not liable as an "owner" under § 240(1) where Public Service Law § 228(1) required landlord to allow employees of a cable company onto its property, gave building owner no ability to determine which company came onto its land, and required no notice of a technician's presence on the land).

        1. Amtrak's Status as an "Owner"

As an initial matter, Lincho asserts that defendants have "wholly failed to disprove their ownership of the wall and the other areas underneath the bridge, where the work took place." Pl. Mem. at 6-7, ¶ 20; see Photograph of Bridge (showing what appears to be a parapet wall).  As to the parapet wall on which Lincho was working, we will accept arguendo that ownership of the wall might impact on Amtrak's status as a statutory owner.  See, e.g., Larosae v. American Pumping, Inc., 73 A.D.3d 1270, 1272 (3d Dep't 2010).  The problem with Lincho's argument is that it fails to recognize that he carries the burden of proof on the issue of ownership.  See, e.g., Pina v. Dora Homes, Inc., 2013 WL 359386, at *3 (E.D.N.Y. Jan. 29, 2013) (where claims were "premised on common-law negligence, and on sections 200 and 241(6) of the New York Labor Law[,] . . . [plaintiff] bears the burden of proof"); Ferra v. County of Wayne, 147 A.D.2d 964, 965 (4th Dep't 1989) (to obtain the absolute liability accorded by Labor Law § 240(1), plaintiff must "establish[] that defendant owner violated Labor Law § 240(1) and that this violation proximately caused plaintiff's injuries").  Because defendants raised the issue of ownership in

their brief, Lincho was required to furnish admissible evidence in support of his claim. See generally Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Lincho, however, has not pointed to any evidence in the record to suggest that Amtrak owns the parapet walls attached to the bridge structure. In light of the uncontroverted evidence in the record showing that NYCDOT, not Amtrak, owned the bridge structure itself, Def.'s Response to Pl.'s Interrogs., No. 6; NY State highway Data, at 5, Lincho has failed to prove that Amtrak owns the walls on which Lincho was working.

With that point put to the side, Lincho's argument essentially boils down to the proposition that because the ladder from which Lincho fell was on land actually owned by Amtrak, Amtrak is necessarily an "owner" under the statute.

This argument has surface appeal but does not survive scrutiny. In Abbatiello v. Lancaster Studio Assocs., 3 N.Y.3d 46 (2004), the New York Court of Appeals made clear that to find an entity to be an "owner" under section 240, there must be a "nexus" between the property owner and the worker, and that the "nexus" must involve some kind of "property interest," such as "a lease agreement or grant of an easement . . . ." Id. at 52; accord Coleman v. City of New York, 91 N.Y.2d 821, 822-23 (1997) (lessor liable as statutory owner); Gordon v. Eastern Ry. Supply, 82 N.Y.2d 555, 559-60 (1993) (same); Celestine v. City of New York, 86 A.D.2d 592, 593 (2d Dep't 1982) (grantor of easement liable as statutory owner). Here, of course, Amtrak granted to no property interest to Judlau but merely gave them permission to enter its land.

In his memorandum of law, see Pl. Mem. at 7-9, Lincho points to cases in which an owner of land was found to be liable as an "owner" where the owner's lessee, not the owner, contracted for the work to be performed. See Gordon v. E. Ry. Supply, Inc., 82 N.Y.2d 555, 560

11

(1993) (property owner liable for injury caused by lessor's contractor); Mijia v. Moriello, 286 A.D.2d 667, 667 (2d Dep't 2001) (fee owner of land liable as statutory owner where owner leased land to another and did not own building that sat upon land); Seemueller v. Cty. of Erie, 202 A.D.2d 1052, 1052 (4th Dep't 1994) (lessor liable as statutory owner); Vargas v. McDonald's Corp., 19 Misc.3d 1116(A), at *1 (Sup. Ct. 2008) (fee owner of land liable as statutory owner where owner leased land to another and did not own building that sat upon land); see also Coleman v. City of New York, 91 N.Y.2d 821, 823 (1997) (defendant City of New York liable as owner for plaintiff's injuries where statutory scheme established a lessor-lessee relationship regarding the premises at issue between City and plaintiff's employer New York City Transit Authority); Celestine v. City of New York, 86 A.D.2d 592, 593 (2d Dep't 1982), aff'd 59 N.Y.2d 548 (1983) (defendant liable as owner where it granted co-defendant an easement over its property). These cases, however, do not control because Lincho has pointed to no evidence in the record to suggest that Amtrak leased to the City of New York the land the Bryant Avenue Bridge sits upon.[4] See also Def. Reply Mem. at 10 ("Defendants did not contract or allow for the Bridge to be placed on their property, nor did they have the control to move the Bridge if they did not want it there."). In the cases cited by plaintiff, the lease agreement operated as the required "nexus" between the out-of-possession owner and the injured party hired by the owner's lessee. See Abbatiello, 3. N.Y.3d at 51.

---

[4] Lincho also cites Wallace v. National R.R. Passenger Corp., 5 F. Supp. 3d 452 (S.D.N.Y. 2014), a case that involved §§ 240 and 241 claims against Amtrak. Pl. Mem. at 9, ¶¶ 26-27. Lincho notes that in that case, the court granted summary judgment to plaintiff on his § 240(1) claim despite Amtrak's argument it did not control his work. Id. That case is inapplicable, however, because Amtrak owned the bridge being repaired in Wallace, see 5 F. Supp. 3d at 459, and, as Wallace noted, an owner's duties under § 240 are nondelegable and so control need not be established, see id. at 468.

The fact that Lincho's injury was caused by virtue of his falling onto the land owned by Amtrak is also not dispositive. For example, courts have declined to find a landowner liable as a statutory owner where an injury incidentally occurs on its property during the course of work on a structure located on an adjoining property. See, e.g., Berrios v. TEG Mgmt. Corp., 7 A.D.3d 555, 556 (2d Dep't 2004) (where plaintiff fell from a ladder onto a roof of building adjacent to building being repaired, owner of adjacent building was not statutory owner even though the feet of the ladder were on the adjacent building); Mangiameli v. Galante, 171 A.D.2d 162, 164 (3d. Dep't 1991) (defendant Homeowner's Association not liable as statutory owner where plaintiff fell from a ladder while performing work on a separately-owned residential unit even though the feet of the ladder were placed on land owned by the Association because defendant "did not own the property upon which plaintiff was to perform his work" and there was no "allegation that the Association had either the authority to contract with plaintiff's employer to perform the work or the right to control the work").

While the parties have not pointed to a case that parallels the facts here, we find Albanese v. City of New York, 5 N.Y.3d 217 (2005), to be instructive. In Albanese, the injured worker was working on a State-run construction project on arterial highways that run through the City of New York. See 5 N.Y.3d at 218-20. Under Highway Law XII-B, the City and State share responsibility for the maintenance of arterial highways, and the City and State shared responsibility for the worksite at issue. Id. at 220-21. The State Department of Transportation had contracted for the project with a general contractor and construction manager. Id. at 219. Like Amtrak here, the City did not participate in negotiations with the contractors or the selection of the contractors, and was not signatory to the contracts; nor did the City perform any of the work on the project. Id. Also like Amtrak here, the City issued permits that "grant[ed] the

State the authority to enter upon and restrict the flow of traffic on the Cross Bronx/Bruckner [Expressway] Interchange" for the purpose of the project, "subject to stipulations imposing conditions on lane closures, traffic flow, storage of materials and the like." Id. (internal punctuation omitted). Like Amtrak here, the City reserved the right to cancel the permits at any time. Id. The City's approval was required for "designs, plans, specifications and estimates of cost thereof" before the State could proceed with construction. Id. at 220. Notwithstanding the City's involvement, Albanese held that because "[t]he City's role was largely confined to its regulatory responsibilities arising out of its work permits," its involvement was "limited" and thus it could not be absolutely liable under the Labor Law. Id. at 221.

As was true in Albanese, Amtrak's granting of a license to enter its land to work on a bridge that it did not own, with the purpose of ensuring that Judlau's work did not interfere with railroad operations, see Specifications; Stypinski Dep. at 27, did not render Amtrak an "owner" within the meaning of Sections 240 and 241.

### 2. Liability as an Agent Under Labor Law §§ 240 and 241

Plaintiff argues that even if Amtrak is not an "owner" it should nonetheless be held liable as an "agent." Pl. Mem. at 9-14.

Under New York Labor Law §§ 240 and 241, an individual or entity can be held liable as an agent of an owner. See N.Y. Labor Law §§ 240-41. The New York Court of Appeals has clearly laid out the requirements for liability as a statutory "agent" for purposes of Sections 240 and 241. As the Court explained in Russin v. Louis N. Picciano & Son, 54 N.Y.2d 311 (1981):

> Although sections 240 and 241 now make nondelegable the duty of an owner or general contractor to conform to the requirement of those sections . . . the duties themselves may in fact be delegated . . . . When the work giving rise to these duties has been delegated to a third party, that third party then obtains the concomitant authority to supervise and control

14

> that work and becomes a statutory "agent" of the owner or general contractor. Only upon obtaining the authority to supervise and control does the third party fall within the class of those having nondelegable liability as an "agent" under sections 240 and 241.

Id. at 318.

Thus:

> An agency relationship for purposes of section 240(1) arises only when work is delegated to a third party who obtains the authority to supervise and control the job. Where responsibility for the activity surrounding an injury was not delegated to the third party, there is no agency liability under the statute . . . .

Blake v. Neighborhood Hous. Servs.of New York City, Inc., 1 N.Y.3d 280, 293 (2003) (citing Russin, 54 N.Y.2d at 318); accord Walls v. Turner Const. Co., 4 N.Y.3d 861, 864 (2005) ("unless a defendant has supervisory control and authority over the work being done when the plaintiff is injured, there is no statutory agency conferring liability under the Labor Law").

Here, no reasonable jury could find that either Judlau or the NYCDOT, the general contractor and owner respectively, delegated to Amtrak supervisory control of the work Lincho was performing. There is no document in which Judlau or the City delegate such authority to Amtrak. The license under which Amtrak permitted Judlau's workers to enter its property does not involve Amtrak assuming any obligations previously undertaken by the City or Judlau. Rather, it circumscribes Judlau's work by limiting the manner in which it may perform its own work to ensure the safety of Amtrak's operations. For this reason alone, Amtrak cannot be found to be an agent.

Lincho makes a number of arguments that Amtrak should be found to have "controlled" the work by Judlau. Pl. Mem. at 10-12. These arguments are irrelevant, however, in that the delegation of control by Judlau or the City never occurred.

15

In any event, no reasonable jury could conclude that Amtrak exercised actual "control" over Lincho's work. Lincho's argument rests on testimony by Stypinski that he had the power to "shut down a job" if he saw unsafe activity. Pl. Mem. at 11. He argues that this testimony raises a triable question of fact as to whether Amtrak had the authority to "'correct or prevent [the] unsafe condition'" that gave rise to Lincho's injuries See id. at 10 (citing In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 44 F. Supp. 3d 409 (S.D.N.Y. 2014)).

Lincho's argument fails to distinguish between the power to stop work at a location or to enforce a license designed to protect Amtrak's operations and the "authority" referred to in Russin to "supervise and control" the work being done. See 54 N.Y.3d at 318. Stypinski never gave any testimony that would allow a jury to infer that he supervised or controlled Judlau's or Lincho's work.

The cases Lincho cites do not support his argument. In Walls v. Turner Const. Co., 4 N.Y.3d 861(2005), the court found a construction manager liable as a statutory agent where he was "under a contractual obligation" to monitor the contractor's window replacement work and to protect the contractor's employees. Id. at 864. The defendant in Walls, the court reasoned, "functioned as the eyes, ears, and voice of the owner" and was "under a contractual obligation to monitor [the contractor's] window replacement work and to protect [the contractor's] employees." Id. at 864. In In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 44 F. Supp. 3d 409 (S.D.N.Y. 2014), the entity held liable "had the authority to avoid or correct" the specific unsafe condition that caused the plaintiff's injuries. Id. at 428-29 (internal punctuation omitted). Indeed, the entity had been specifically hired to monitor the condition — unsafe levels of pollutants — that ultimately caused the plaintiff's injury. Id. Here, of course, there is no evidence that Amtrak had been engaged to supervise the erection of the scaffold that caused

16

Lincho's injury.

In other cases cited by plaintiff, the courts actually ruled against the plaintiff because of the same kind of failure of proof exhibited by plaintiff here. Thus, Russin found that three prime contractors at a worksite were not liable as an agents, noting that agency can be found only where the contractor "obtain[s] the authority to supervise and control" the work. 54 N.Y.2d at 318; see also id. ("Our interpretation of the statutory 'agent' language appropriately limits the liability of a contractor as agent for a general contractor or owner for job site injuries to those areas and activities within the scope of the work delegated or, in other words, to the particular agency created."). DiIeso v. Hill Int'l, Inc., 2015 WL 1475826 (E.D.N.Y. Mar. 30, 2015), granted summary judgment for a construction consultant on the question of whether he was an agent under § 240(1) where the contract specifically provided that a contractor, not the consultant, was to be responsible for means and methods of construction even though the contract also required the consultant to report safety hazards to the commissioner overseeing the project. Id. at *4.

The case of Blake v. Neighborhood Hous. Servs. of New York City, Inc., " 1 N.Y.3d 280 (2003), is also unhelpful to plaintiff. In Blake, the Court of Appeals declined to hold the defendant liable as an agent, where the defendant, a non-profit lender that financed the project, "coordinated home repair work" but "did not involve itself with the details of how individual contractors would perform their jobs." 1 N.Y.3d at 293. In Blake, "[t]he homeowner retained primary control over decisions on how the renovation project would proceed. [The defendant] did not supervise the contractor; it never instructed workers on how to undertake repairs, and it took only a de minimis role in ensuring that the contractor would complete the financed repairs." Id. The same is true of Amtrak here. It did not supervise Judlau's work, it did not instruct

17

Judlau's workers on how to undertake their work, and had no role whatsoever in ensuring that Judlau would complete its work.

In sum, there is no basis on which Amtrak could be found liable as an "agent" of an owner or contractor.

C. Common Law Negligence and Liability Under §§ 200

Amtrak also moves for summary judgment on Lincho's § 200 and common law negligence claims.

"Section 200 of the Labor Law merely codified the common-law duty imposed upon an owner or general contractor to provide construction site workmen with a safe place to work . . . ." Russin, 54 N.Y.2d at 316-17 (internal citation omitted). "Because § 200 is a codification of the common law of negligence, courts generally analyze claims brought under both § 200 and the common law simultaneously." Zapata v. Riverside Study Ctr., Inc., 2012 WL 1744792, at *9 (S.D.N.Y. May 16, 2012) (citing Wojick v. 42nd St. Development Project, 386 F. Supp. 2d 442, 455 n.15 (S.D.N.Y. 2005)).

"Cases involving Labor Law § 200 fall into two broad categories: namely, those where workers are injured as a result of dangerous or defective premises conditions at a work site, and those involving the manner in which the work is performed." Ortega v. Puccia, 57 A.D.3d 54, 61 (2d Dep't 2008).

"Where a premises condition is at issue, property owners may be held liable for a violation of Labor Law § 200 if the owner either created the dangerous condition that caused the accident or had actual or constructive notice of the dangerous condition that caused the accident." Id. (citations omitted). Lincho points to no evidence to suggest that there were "dangerous or defective premises conditions" on Amtrak's land, see id., let alone conditions that

18

Amtrak created or that it had constructive notice of. Thus, his citation to a case involving unsafe conditions is irrelevant. See Pl. Mem. at 14 (citing Mangiameli v. Galante, 171 A.D.2d 162 (3rd Dep't 1991)).

"[W]hen the manner of work is at issue, no liability will attach to the owner solely because [he or she] may have had notice of the allegedly unsafe manner in which work was performed." Ortega, 57 A.D.3d at 61 (internal citations and quotations omitted). "Rather, when a claim arises out of alleged defects or dangers in the methods or materials of the work, recovery against the owner or general contractor cannot be had under Labor Law § 200 unless it is shown that the party to be charged had the authority to supervise or control the performance of the work." Id. "A defendant has the authority to supervise or control the work for purposes of Labor Law § 200 when that defendant bears the responsibility for the manner in which the work is performed." Id. at 62.

For the reasons just discussed, there is no evidence that Amtrak had authority to "supervise or control" the work. Lincho cites to Humphrey v. Park View Fifth Ave. Assocs. LLC, 113 A.D.3d 558 (1st Dep't 2014), Pl. Mem. at 15, a case in which the First Department declined to dismiss common law negligence and § 200 claims related to manner-of-work. In Humphrey, the defendant construction manager testified in his deposition that he would "walk around" with employees of the plaintiff's employer and "ma[ke] sure that they're doing what they're supposed to." Id. at 559. In that case, the defendant was identified as the "site safety manager." Id. Thus, there was a reasonable inference that the defendant had a role in supervising the manner in which the contractor's employees performed their work. Here, there is no evidence in the record to suggest that Amtrak personnel present on the work site had the authority to control or supervise the manner in which Judlau's employees were performing work.

That an Amtrak employee had the power under the Permit to stop work in order to require compliance with the Permit does not reflect such authority.

This case is much more analogous to Comes v. New York State Elec. & Gas Corp., 82 N.Y.2d 876 (1993). In Comes, a worker injured by a steal beam at a construction site sued the owner of the work site, who had hired a construction inspector, under section 200. Id. at 877. Comes noted that there was "no evidence that defendant exercised supervisory control or had any input into how the steel beam was to be moved." Id. While the defendant had hired a construction inspector, the inspector's "duties were limited to observing the work and reporting to the contractor safety violations by the employees." Id. Thus, even though this construction inspector was charged with monitoring safety, this was insufficient to establish supervisory control over the manner in which the task causing injury was performed. See id.

For these reasons, plaintiff has not shown that Amtrak is liable under section 200 or for common law negligence.

## CONCLUSION

Accordingly, Amtrak's motion for summary judgment (Docket # 22) is granted. All of Lincho's claims therefore are dismissed with prejudice. The Clerk of the Court is requested to enter judgment.

SO ORDERED.

Dated: October 12, 2018

New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

20